

**DLA Piper LLP (US)**
51 John F. Kennedy Parkway
Suite 120
Short Hills, New Jersey 07078-2704
www.dlapiper.com

Marc A. Silverman
marc.silverman@us.dlapiper.com
T   973.520.2550
F   973.520.2551

May 13, 2022
*VIA ECF*

Hon. Magistrate Judge Edward S. Kiel
United States District Court
District of New Jersey
Martin Luther King Building & U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07101

**Re:**   *Securities and Exchange Commission v. RRBB Asset Management, LLC, and Carl S. Schwartz*, **Case No. 2:20-cv-12523-KM-ESK**

Hon. Magistrate Judge Kiel:

We represent defendant Carl S. Schwartz in the above-referenced matter, and write jointly with RRBB Asset Management, LLC ("RRBBAM") (together "Defendants") pursuant to Your Honor's Civil Case Management Order Rule 7 and Local Rules 16.1 and 37.1, to raise a critical issue related to the SEC's Expert Report of Erin E. Smith, Ph.D. (the "Smith Report").  Defendants respectfully request an expedited conference or a stay of expert discovery pending resolution of Defendants' upcoming motion to strike the Smith Report for asserting a new undisclosed theory of the case that is inconsistent with the Complaint and was not disclosed during the discovery period.  The Defendants' deadline for expert disclosure is currently set for May 30, 2022, and without a stay, Defendants will be prejudiced by having to expend portions of their limited funds and resources responding to the Smith Report's inclusion of previously undisclosed theories and at the same time moving to strike same.  The Plaintiff Securities and Exchange Commission ("SEC") opposes Defendants' request, and its position is set forth in Section III of this letter.

## I.   Defendants' Request, the SEC's Response, and Efforts to Resolve the Dispute

On May 6, 2022, Defendants sent the SEC a letter identifying their objections to Smith Report and requesting that it be withdrawn.  (Ex. A.)  The SEC did not agree to withdrawing the Smith Report, refused to provide a justification for the new undisclosed theory, and responded to the Defendants' concerns only by stating that the Defendants' letter was "frivolous."  (Ex. B.)



May 13, 2022
Hon. Magistrate Judge Edward S. Kiel
Page Two

## II.      Defendants' Position

The Smith Report is based on an previously undisclosed and entirely new theory of the case, with an entirely new and expanded relevant period—namely, Plaintiff now asserts that Defendants favored not only the Butters account between August 2016 and April 2017 (the Relevant Period as pleaded in the Complaint), but that Defendants favored each and every other RRBBAM client during that same time period.  By playing fast and loose with the definition of "Favored Accounts" and the relevant time periods the SEC has completely changed its theory from the one it chose to allege in the Complaint.

In determining whether to strike an expert report based on a party's failure to disclose its theory, a court considers:

> (1) the importance of information withheld; (2) the prejudice or surprise to the party against whom the evidence is offered; (3) the likelihood of disruption of the trial; (4) the possibility of curing the prejudice; (5) the explanation for the failure to disclose; and (6) the presence of bad faith or willfulness in not disclosing the evidence.

("the *Pennypack* factors").  *ViaTech Techs., Inc. v. Microsoft Corp.*, No. CV 17-570-RGA, 2021 WL 663057, at *1 (D. Del. Feb. 19, 2021); *see also Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904-905 (3d Cir. 1977).

The Defendants have been surprised and irrevocably prejudiced by the SEC's conduct in this case that cannot be cured at this point considering Defendants' motion to dismiss has been denied and the parties have engaged in over a year and a half of litigation based on the original theory.

### A.      The SEC's Complaint Defined "Favored Accounts" as Only the Butters Accounts and Classified All Other Accounts Managed by RRBBAM as Disfavored

The Complaint expressly pleads that between August 2016 and April 2017 (the "Relevant Period") Defendants favored accounts associated with Robert Butters and disfavored all other accounts and it is this activity that serves as the basis for the SEC's causes of action.  In the Complaint, the SEC alleges that during the Relevant Period, Defendants "cherry picked" profitable trades to an account held "by a new client, *a high net-worth couple* . . . while allocating less profitable trades to RRBB's other clients"  (Compl. ¶¶ 1-2 (ECF 1) (emphasis added).)  The SEC then explicitly defined the phrase "Favored Accounts" as "accounts held by a new client, *a high net-worth couple*."  (*Id.* ¶ 30



May 13, 2022
Hon. Magistrate Judge Edward S. Kiel
Page Three

(emphasis added).)  That single "high net-worth couple" was the Butters.  The Complaint then referenced an August 29, 2016 email "to the owners of the Favored Account" as support of its allegations.  (*Id.* ¶ 42.)  That referenced email was to the Butters.  The SEC further referenced that the "Favored Accounts" "signed a Discretionary Interment [sic] Management Agreement with RRBB in July 2016."  (*Id.* ¶ 40.)  The clients who signed that agreement in July 2016 were the Butters.

The Complaint also alleges that all other clients during the Relevant Period were disfavored accounts.  The SEC asserted that, while Defendants were favoring Butters during the Relevant Period, they were allocating "less profitable trades to *RRBB's other clients*."  (*Id.* ¶¶ 1-2 (emphasis added).)  The SEC defined the "Disfavored Accounts" as six accounts associated with two elderly widows, which were Greta Roesch and Jane Tang.  (*Id.* ¶¶ 46-48.)  The SEC then lumped all other accounts as part of a larger class of disfavored accounts during the Relevant Period: "[Defendants] cherry-pick[ed] favorable trades for the Favored Accounts and *allocate[ed] less favorable trades to RRBB other accounts*, and especially to the Disfavored Accounts."  (*Id.* ¶¶ 86, 90 (emphasis added).)

The Complaint's scienter allegations are in line with this same theory.  The Complaint alleges that the sole motivation for the alleged cherry picking scheme was to induce the Favored Accounts (that is Butters) to invest additional funds.  The Complaint alleges that, when Butters signed the July 2016 agreement, he made a "small investment," was considering investing "an additional $6 million," and was playing "close attention to how Schwartz was investing their assets."  (*Id.* ¶¶ 40-41.)  The Complaint specifically alleges that "Schwartz executed his cherry-picking scheme to benefit the Favored Accounts to induce the account holders to invest additional funds with RRBB."  (*Id.* ¶ 39.)  The Complaint makes no allegations of scienter as to allegedly favoring the other accounts during the Relevant Period.

The SEC reiterated its theory in pleading the causes of action alleged in the Complaint: "[Defendants] cherry-pick[ed] favorable trades for the Favored Accounts and *allocate[ed] less favorable trades to RRBB other accounts*, and especially to the Disfavored Accounts."  (*Id.* ¶¶ 86, 90 (emphasis added).)

      B.    *The Court Believed There Was Just One Favored Account in Which Scienter Was Pleaded*

In allowing the SEC to survive Defendants' motion to dismiss, the Court was under the same impression that the Favored Accounts were a single set of account for Butters, and that all other



May 13, 2022
Hon. Magistrate Judge Edward S. Kiel
Page Four

accounts were Disfavored Accounts.  (ECF 30 at 2 ("Schwartz allocated a disproportionate number of favorable trades (*i.e.*, trades that had a positive first-day return) to accounts held by *a new client (a high-net-worth couple)*, and unfavorable trades (*i.e.*, trades that had a negative first-day return) to *other clients*." (emphasis added).)  Indeed, the SEC fostered this understanding in its opposition on the motion to dismiss, pointing to the August 2016 email "to his favored client," and that scienter was pleaded through knowledge that the "holders of the Favored Accounts were considering tripling their investment."  (ECF 14 at 3-4; *id.* at 7-8, 23-24 ("Schwartz executed his cherry-picking scheme to benefit the Favored Accounts to induce the account holders to invest additional funds with RRBB.").)

Indeed, in denying the motion, the Court expressly held that the SEC sufficiently pleaded scienter as to only the Butters accounts by relying on the following allegations:

- "Schwartz engaged in omnibus trading, yet the first-day return rates for the favored accounts were substantially higher than those for the disfavored accounts and *all other RRBB accounts*."  (ECF 30 at 6 (emphasis added).)

- "Schwartz made such trades to induce the favored account holders to invest additional funds with RRBB."  (*Id.* at 2.)  In doing so, the Court referenced the email to Butters that the SEC relied upon in its Complaint.  (*Id.* at 6.)

- "Further, he favored certain accounts, inferably because he knew these high-net-worth clients would then be motivated to continue using his services."  (*Id.* at 10.)

Notably, the Court relied on the SEC's theory pleaded in the Complaint to deny Defendants' particularity arguments.  The Defendants argued that the Complaint failed Rule 9(b)'s particularity requirement for being impermissibly vague because the Complaint left them to "guess as to the precise charges against them."  (ECF 12-1 at 18.)  The Court rejected Defendants' particularity arguments on the basis that the SEC pleaded the "who, what, when, where, and how."  (ECF 30 at 7.)  The Court understand the "who" "what" "where" and "how" as based on the allegation that "Schwartz allocated a disproportionate number of favorable trades (*i.e.*, trades that had a positive first-day return) to accounts held by *a new client (a high-net-worth couple)* [Butters], and unfavorable trades (*i.e.*, trades that had a negative first-day return) to *other clients*."  (ECF 30 at 2, 7 (emphasis added).)  The "when" was the "certain time period" alleged in the Complaint and explained in the SEC's opposition—August 2016 to April 2017.  (*Id.*; Compl. ¶¶ 1-2; ECF 14 at 6 ("RRBB and Schwartz breached their fiduciary duties to their advisory clients by engaging in an



May 13, 2022
Hon. Magistrate Judge Edward S. Kiel
Page Five

undisclosed cherry-picking scheme that began no later than August 12, 2016 and continued through at least April 10, 2017.").)

      C.    *The SEC Identified Only Butters as the Favored Account in Its Interrogatory Responses*

Defendants served Interrogatories in an attempt to dispel any confusion and were assured the only Favored Accounts during the Relevant Period was the Butters.  Defendants' Interrogatories 3, 4, and 5 expressly requested the identification of the Favored Accounts, the Disfavored Accounts, and "all other RRBB accounts (*not including the Favored Accounts*)."  (Ex. C at 6-7 (emphasis added).)

The SEC gave the same answer for all three Interrogatories: it referred to a spreadsheet entitled Analysis data "which reflects all accounts by account number, account name, account type (Butters, Disfavored and Other)."  (*Id.*)  The Spreadsheet identified the Disfavored Accounts as those belonging to Roesch and Tang.  (*Id.* at 26.)  It identified the "Other" accounts (*not including favored*) as including all other accounts.  (*Id.* at 26-28.)  Butters was its own category—leaving the only conclusion that he alone is the Favored Account.  (*Id.* at 26.)

      D.    *The Smith Report Claims that All Other Accounts Are Favored Accounts*

Following the close of discovery, the SEC has expanded the scope of the Relevant Period, changed the definition of the term Favored Accounts and now claims through the Smith Report that all "other clients" are actually Favored Accounts during the Relevant Period.  (*See, e.g.*, Ex. D, Smith Report ¶¶ 7, 13 n.2, 19, 20 n.5.)  Whereas in the Complaint, the "other clients" were part of the Disfavored Accounts category during the Relevant Period between August 2016 and April 2017, they are now part of the Favored Accounts category during that same period:



May 13, 2022
Hon. Magistrate Judge Edward S. Kiel
Page Six

| Complaint | Smith Report |
|---|---|
| "From at least August 2016 through April 2017, [Defendants] . . . disproportionately allocated profitable trades to accounts held by a new client, a high net-worth couple, who was one of RRBB's largest and most lucrative clients in terms of assets under management, while *allocating less profitable trades to RRBB's other clients*." (¶¶ 1-2 (emphasis added).) | "[F]rom at least January 1, 2015 through April 10, 2017 [Defendants] . . . disproportionately allocated unprofitable trades from RRBBAM's omnibus trading account to accounts owned by two elderly clients (the 'Disfavored Accounts') for the *benefit of Mr. Schwartz's other clients* (owners of the 'Favored Accounts') who received a disproportionate amount of the more profitable trades." (¶ 7 (emphasis added).) |
| "Schwartz's trade allocations from RRBB's omnibus account favored the Favored Accounts and *disfavored RRBB's other clients*, especially the Disfavored Accounts." (¶ 70 (emphasis added).) | "Disfavored Accounts are accounts associated with two individuals . . . . *All other accounts over which Mr. Schwartz had discretion are Favored Accounts.* As mentioned above, accounts owned by Mr. and Mrs. Butters comprise a subset of the Favored Accounts, the "Butters Accounts" . . . . *All other Favored Accounts comprise the "Other Favored Accounts*." (¶ 20 n.5 (emphasis added).) |

While our experts are still evaluating the data and conclusions in the Smith Report, this reallocation of "other accounts" from the Disfavored Accounts to Favored Accounts during the Relevant Period allows the SEC to present misleading and distorted statistics to creatively create larger differences between the categories, create a statistical significance where there may be none, and to furtively amend the complaint. *See United States v. Schiff*, 602 F.3d 152, 161 (3d Cir. 2010) ("Since then, its introduction of new legal theories appears designed to find creative ways to hold Schiff and Lane liable for those SEC filings."). For example, the Smith Report claims, in bolded red font, that the "T-Statistic / Significance" of the Disfavored Accounts is -7.00. (Ex. D, Smith Report ¶ 21.) The Smith Report uses this t-statistic to show that anything more (in absolute value) than 1.96 means that the trading "cannot be due to random chance" and is therefore indicative of cherry-picking. (*Id.* ¶¶ 35-36.) But it was only by changing the "Other Accounts" to "Favored Accounts" that the Smith Report could show a statistical significance. When placing the "Other Accounts" back to "Disfavored Accounts" (as pleaded in



May 13, 2022
Hon. Magistrate Judge Edward S. Kiel
Page Seven

the Complaint), the t-statistic drops below (in absolute value) 1.96—meaning that there is *no statistical significance.*

       E.      *The Pennypack Factors Justify Exclusion*

This change has prejudiced Defendants, who were (like the Court) always under the impression that the only Favored Account during the Relevant Period was the Butters account. Defendants engaged in this entire litigation in good faith with that understanding in mind. The Defendants moved to dismiss based on the allegations of the Complaint and the Court denied that motion based on those allegations. Defendants were deprived of an opportunity to meaningfully challenge the SEC's theory in the motion to dismiss that there was scienter to favor all other accounts during the Relevant Period. Indeed, the Smith Report suggests a theory that is not cherry-picking at all. Defendants could not have plausibly "cherry-picked" for nearly all clients because, by its very nature, cherry-picking involves preferential treatment for the investment adviser himself, his firm, or family members.[1] (*See* ECF 30 at 5.) Preferring nearly *all* accounts flies in the face of any plausible allegation of preferential treatment. This reverse cherry-picking theory has no basis in logic or precedent. Further, as articulated in its motion to dismiss, Defendants were forced to guess at the precise allegations of the Complaint, which the SEC assured them and the Court was limited to the Butters account as Favored Accounts and all other accounts were disfavored during the Relevant Period.

As a result of the SEC's failure to disclose, Defendants were unable to engage in discovery to rebut that theory. *See ViaTech*, 2021 WL 663057, at *2 (striking where defendants "did not have the opportunity during the previously closed fact discovery to 'take any discovery on the factual bases of these new theories' nor 'develop its own factual record.")*. During discovery, Defendants spoke with the only disclosed favored account, Butters, and were informed by him that he had never been approached by the SEC prior to its filing of the Complaint and that he had not based his decisions to commit new capital to RRBB on the performance of the account. Butters also affirmed that he never led Defendants to believe that he would do so if he received profitable trades over other accounts. Had the SEC properly disclosed its theory that all other RRBB accounts were favored as well during the same period, Defendants would have

---

[1] As explained in Defendants' motion to dismiss, this is a case of first impression because all other similar cases involve allegations of cherry picking to the adviser himself, his firm, or family members. (ECF 12-1 at 11-12.) Now it does not even resemble cherry picking at all.



May 13, 2022
Hon. Magistrate Judge Edward S. Kiel
Page Eight

approached some or all of those account holders, and addressed their view of the risk profile for their accounts and the basis for their decisions to invest with RRBBAM among other things.[2]

The SEC cannot wait for the time for leave to amend and the discovery period to expire to move forward on a theory that they did not properly plead. *See ViaTech*, 2021 WL 663057, at *2 ("Plaintiff does not need the DOE theories; it simply wants to advance new and additional theories."); *Valentin v. Phila. Gas Works*, 128 F. App'x 284, 287 (3d Cir. 2005) ("The facts underlying the new legal theory are based on facts Valentin was aware of well before the close of discovery."). Even though trial has not been scheduled, allowing additional fact and expert discovery on this theory will not mitigate the prejudice because the damage has been done—the SEC's allegations as it stands have irrevocably damaged Defendants' reputations and it would violate "fundamental due process to toss out a new theory now." *See United States v. Schiff*, 538 F. Supp. 2d 818, 841 (D.N.J. 2008), *aff'd*, 602 F.3d 152 (3d Cir. 2010).

This SEC willfully chose not to disclose this theory and obfuscated the Relevant Period, Favored Accounts, and Disfavored Accounts in its pleadings, representations to the Court, and its Interrogatory Responses. The SEC has also refused to provide any explanation for its failure to timely disclose this theory. Like the situation in *ViaTech*, it is impossible to "understand how Plaintiff's experienced lawyers could have thought that springing clearly new theories on a defendant in opening expert reports was in compliance with the scheduling order, the Rules, or expected standards of practice." 2021 WL 663057 at *5. This stealth attempt to amend the

---

[2] The SEC will likely claim it disclosed this theory by alleging in Paragraphs 55-59 of the Complaint that Defendants favored the other accounts between January 1, 2015 and August 11, 2016. (*See* Compl. ¶¶ 55-59.) But that does not disclose that the other accounts were favored *after* August 2016. To the contrary, the Complaint expressly claims that after August 2016 through April 2017 (the Relevant Period in which it bases its fraud allegations), the other accounts were *disfavored* during this period. (*See id*. ¶¶ 1-2 (between August 2016 and April 2017 Defendants were allegedly "allocating less profitable trades to RRBB's other clients"), ¶ 29 (cherry picking "began no later than August 12, 2016 and continued through at least April 10, 2017"); ¶ 51 ("other RRBB accounts" had a performance rate of "less than half the performance … achieved for the Favored Accounts"). And importantly, the SEC *chose* to bring fraud claims based solely on the August 2016 to April 2017 period, in which the SEC claimed that the other accounts were disfavored accounts and that the motivation for this cherry picking scheme was to incentivize Butters to make additional investments. (*See id*. ¶¶ 1-2, 86 (alleging "cherry-picking favorable trades for the Favored Accounts and allocating less favorable trades to RRBB other accounts, and especially to the Disfavored Accounts").) Moreover, to the extent the SEC claims it alleged that the "other accounts" were not *as* disfavored as the two Disfavored Accounts and therefore "favored," that is contrary to the Complaint. In the "Disfavored Accounts" section of the Complaint, the SEC alleges that the "other accounts" only achieved "half the performance … for the Favored Accounts." (*Id*. ¶ 51.) Thus, the allegation was offered to show that the "other accounts" were disfavored vis a vis the Butters account during the Relevant Period, and thus part of the Disfavored Accounts category. (*See id.*)



May 13, 2022
Hon. Magistrate Judge Edward S. Kiel
Page Nine

complaint and inject new theories of liability violates due process, the Federal Rules of Civil Procedure, the scheduling orders, expected standards of practice, and fundamental fairness. *See Schiff*, 538 F. Supp. 2d at 841 ("Many months and reams of paper have been devoted to the *Daubert* process, and it is a violation of the procedural rules set forth in the Federal Rules of Criminal Procedure, the FRE, and fundamental due process to toss out a new theory now."). These violations justify exclusion and the Court should therefore stay Defendants' time to respond pending its upcoming motion to strike.

III.    **The SEC's Position**

Defendants' position is frivolous.

A.  **Defendants Have Failed to Establish Good Cause for a Further Amendment to the Scheduling Order.**

As a procedural matter, this is not a "discovery dispute" subject to the Court's requirement of a joint letter.  Nonetheless, the SEC will express its views here, to expedite the resolution of Defendants' request for a further amendment to the scheduling order in this case, for which Defendants have failed to establish good cause, as required by L.R. 16.1(2).

Defendants recognize that Your Honor does not have the authority to rule on their contemplated "motion to strike" the SEC's expert's report.  Any such motion should be considered in the context of a motion *in limine* before the trial judge, to exclude or limit the testimony expert testimony under Rule 702 of the Federal Ruled of Evidence, and *Daubert v. Merrel Dow Pharms., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichae*l, 526 U.S. 137 (1999). Currently, there is no final pretrial conference date, much less any schedule for the filing of any such any motion *in limine*. As such, Defendants are inviting this Court to grant a virtually unlimited extension of the expert discovery deadline before they submit a rebuttal report to the SEC's expert report, along with a corresponding unlimited extension of time to conduct depositions of the parties' experts.  In short, Defendants' proposed piecemeal approach, of attempting to insert an *in limine* motion to exclude or limit the SEC's expert's testimony before having to submit a rebuttal report, will throw the pre-trial schedule into chaos and only further extend discovery deadlines and ultimately the trial in this case.  The complaint in this case was filed on September 20, 2020, and



May 13, 2022
Hon. Magistrate Judge Edward S. Kiel
Page Ten

it is appropriate that a final pretrial conference date finally be set, as opposed to a needless continuance of expert discovery dates.

Furthermore, Defendants' challenge to the SEC's expert's report only goes to a portion of Dr. Smith's analysis. Defendants do not dispute the relevancy or admissibility of Dr. Smith's opinions regarding the so-called "Butters period" from August 2016 to March 2017, but only her opinions that address the fact that statistical evidence shows that the so-called "Disadvantaged Accounts" had been the victims of Defendants' cherry picking scheme since at least January 2015. For the Court's convenience, a copy of Dr. Smith's expert report as attached as **Exhibit D**.

Defendants have also failed to establish any hint of prejudice. They claim they would have conducted additional discovery had they known – *as the complaint plainly alleges* – that the operative period of Defendants' fraudulent conduct extends back to January 2015. To date, Defendants have only taken the depositions of two 30(b)(6) witnesses of Charles Schwab, which terminated RRBBAM as a client based on their concerns that Defendants had engaged in cherry picking. That testimony has no bearing on Dr. Smith's opinions. Nonetheless, the SEC agreed to numerous continuances of the expert discovery deadline, to accommodate Defendants' desire to depose Schwab, so as to allow the period of fact discovery to formally close before the period for expert discovery. But the fact of the matter is that Defendants had all the discovery they required, well over a year ago, if not before the inception of this action, to conduct whatever statistical analysis they wanted of RRBBAM's trade blotter.

In an attempt to establish prejudice based on their specious claim of lack of notice that the alleged conduct at issue dates back to January 2015, Defendants contend they only "inquired" of the holders of the so-called "Favored Accounts," but failed to make similar "inquiries" of any other account holders. Nothing prevents Defendants from making "inquiries" of their clients at any time they want, including the present or the future, and they make no claim that the only means they could make such "inquiries" of their clients are through formal depositions under Rule 30 of the Federal Rule of Civil Procedure.

In short, it is up to Defendants to decide whether they want their expert to analyze only the so-called "Butters period" or to also consider the additional period – *plainly and repeatedly alleged in the SEC's complaint* – that extends back to January 2015. If Defendants contend that earlier period is appropriately the subject of a motion *in limine* motion and should be excluded, any such motion can resolved at the appropriate time under whatever pretrial schedule is adopted. But to allow Defendants to delay the close of expert discovery until the District Court resolves their



May 13, 2022
Hon. Magistrate Judge Edward S. Kiel
Page Eleven

proposed "motion to strike" only invites further delay, which perhaps is Defendants main, if not sole, objective.

Furthermore, Defendants' contemplated "motion to strike" the SEC's expert report is unprecedented. The SEC's expert's report will not come into evidence; as such there is nothing to strike. Again, all Defendants want is a premature determination of the permissible scope of the SEC's expert's testimony before they serve a rebuttal report. Needless to say, Defendants cite to no precedent justifying their tactic.

**B. Defendants' Contemplated "Motion to Strike" is Frivolous.**

Defendants' threatened motion to strike, which is the predicate for their request for a further modification of the scheduling order, is patently frivolous. While Your Honor is not, and will not be asked to rule on that motion, Defendants attempt to use it as a means of establishing good cause for their requested extension. As set forth above, even if Defendant's contemplated motion had merit, it would not justify any modification to the scheduling order. In any event, there proposed motion is utterly lacking in merit.

Defendants contend that the SEC is attempting to amend its complaint to assert some new theory that the Disadvantaged Accounts had been the victim of Defendants' cherry picking practices both during and prior to the so-called Butters period, and that Defendants had no notice of the SEC's allegedly new, and unpled theory until reading Dr. Smith's report. Nothing can be further from the truth.

     a.  **Defendants were on notice of the time scope of the alleged misconduct before the Complaint was even filed in this action.**

Prior to the filing of the SEC's complaint, the SEC typically engages with defense counsel, in in what is known as the "Wells process," where the SEC invites defense counsel to explain why, in their view, identified claims should not be brought. As part that process, the SEC identified the so-called pre-Butters period as further evidence of Defendants' cherry picking scheme. In response, Defendants' counsel acknowledged the staff's "expansion of the time frame" to include the entire period the so-called "Disadvantaged Accounts" received a disproportionate allocation of unfavorable trades, and stated, in relevant part:

> Staff obtained a trade blotter reflecting the use of an omnibus account by Respondents during the period January 2, 2015 to June 30, 2017. Initially staff only alleged a "cherry- picking" scheme existed during the period September 2016 to May 2017. ***In***



May 13, 2022
Hon. Magistrate Judge Edward S. Kiel
Page Twelve

>*the Supplemental Wells notice, Staff has now alleged improper activity across the entire period reported on the blotter*, but now, there has not been an identification of any "favored" account in the expanded time frame. To the contrary, there is only identification of two disfavored accounts, with no suggestion as to any motivation for Respondents to disfavor these accounts until the purported favored account is open

*See* **Exhibit E,** attached hereto (Defendants' Supplemental Wells Response, dated July 27, 2020). As such, even before the SEC's complaint was filed, Defendants were on notice that, in the staff's view, Defendants' cherry picking scheme extended as far back as January 2015.  Notably, Defendants, in their supplemental Wells response also acknowledge receipt of RRBBAM's trade blotter, so that they have had nearly two years to conduct whatever statistical analysis they want of the trade blotter.

### b.  The Complaint Plainly Puts In Issue The Pre-Butters Period

The SEC's Complaint also plainly and repeatedly places in issue the so-called pre-Butters period.  In relevant part, the Complaint alleges:

> Before the new advisory client, the high net-worth couple, invested with RRBB in August 2016, Schwartz and RRBB had cherry picked to the detriment of the Disfavored Accounts, for the benefit of the RRBB other accounts, since at least January 1, 2015.

Complaint, ¶ 55.

> From approximately January 1, 2015 through August 11, 2016, Schwartz and RRBB disproportionately allocated unfavorable trades to the Disfavored Accounts and disproportionally allocated favorable trades to RRBB other accounts.

Complaint, ¶ 56.

> During this period, the Disfavored Accounts achieved average first day *negative* returns of -0.345% while RRBB other accounts achieved average first day positive returns of 0.381%.

Complaint, ¶ 57

> Again, the likelihood that this disproportionate first day profit between the



May 13, 2022
Hon. Magistrate Judge Edward S. Kiel
Page Thirteen

> Disfavored Accounts and RRBB's other accounts resulted from random chance – as opposed to knowing and intentional conduct – is, at best, less than one in a million.
> .

Complaint, ¶ 58.[3]

> In addition, from at least January 2015 through August 11, 2016, Schwartz allocated a disproportionate number of unfavorable trades to the Disfavored Accounts.

Complaint, ¶ 74.

### c. Defendants sought discovery from the SEC on the pre-Butters period.

The fact that Defendants were on notice that the SEC's allegations included the pre-Butters period is further demonstrated by the interrogatories they propounded, which paralleled the allegations in the Complaint.

### <u>INTERROGATORY NO. 18:</u>

> Identify all facts, including all underlying trades, mathematical equations and/or statistical analysis, supporting your allegation that, "Before the new advisory client, the high net-worth couple, invested with RRBB in August 2016, Schwartz and RRBB had cherry picked to the detriment of the Disfavored Accounts, for the benefit of the RRBB other accounts, since at least January 1, 2015," as alleged in Paragraph 55 of the Complaint.

---

[3] Defendants argue that in its complaint, the SEC failed to allege Defendants' acted with "scienter" during pre-Butters period. "Scienter" has been defined to mean knowing or reckless misconduct. *SEC v. U.S. Funding Group*, Civ. No. 02-2089 (WJM), 2006 U.S. Dist. LEXIS 24789, at *14 (D.N.J. Apr. 11, 2006). Here, the complaint alleges that Defendants acted with scienter, and plainly alleges in paragraph 58 of the Complaint, that the chances the disproportionate first day profit between the Disfavored Accounts and RRBB's other accounts resulted from random chance – a**s opposed to knowing and intentional conduct** – is, at best, less than one in a million (emphasis added). In other words, and as the SEC repeatedly alleges, Defendants' cherry picking scheme involved knowing conduct.



May 13, 2022
Hon. Magistrate Judge Edward S. Kiel
Page Fourteen

**INTERROGATORY NO. 19:**

Identify all facts, including all underlying trades, mathematical equations and/or statistical analysis, supporting your allegation that, "From approximately January 1, 2015 through August 11, 2016, Schwartz and RRBB disproportionately allocated unfavorable trades to the Disfavored Accounts and disproportionally allocated favorable trades to RRBB other accounts," as alleged in Paragraph 56 of the Complaint.

**INTERROGATORY NO. 20:**

Identify all facts, including all underlying trades, mathematical equations and/or statistical analysis, supporting your allegation that, "During this period, the Disfavored Accounts achieved average first day negative returns of -0.345% while RRBB other accounts achieved average first day positive returns of 0.381%," as alleged in Paragraph 57 of the Complaint.

**INTERROGATORY NO. 21:**

During the period January 1, 2015 to August 11, 2016, do you contend Schwartz or RRBB "favored" any particular accounts, and if so, identify the name(s) of any accounts that you contend were favored and the time period in which these accounts were purportedly favored.

Furthermore, Interrogatory No. 21, and the SEC's response thereto is highly instructive. In their letter to the Court, Defendants contend that the SEC has introduced a new theory of liability, that is, that during the pre-Butters period, there were other "favored accounts." Clearly, if the "Disadvantaged Accounts" were allocated a disproportionate number of unfavorable trades, such a conclusion can only be reached by comparison to RRBBAM's other client accounts. In answer to Interrogatory No. 21, the SEC clearly explained its position.

The SEC contends that during the period January 1, 2015 to August 11, 2016 Defendants disfavored the Disfavored Accounts, for the benefit of their Other Client Accounts. Within this latter group of Other Client Accounts, the SEC does not contend that particular accounts were favored relative to others. Rather, the group of Other Client Accounts was favored relative to the Disfavored Accounts.
In further answer to this Interrogatory, the SEC refers Defendants to the Excel spreadsheet entitled Analysis Data, produced contemporaneously herewith, which  reflects all accounts by account number, account name, account type (Butters, Disfavored and Other) and all allocations, by trade date, buy time, symbol,



May 13, 2022
Hon. Magistrate Judge Edward S. Kiel
Page Fifteen

> quantity, buy price, investment cost, day trade quantity, sell time, sell price,
> allocation time, price at allocation, first day profit, first day return, account number,
> account type and sample period, for the period January 2, 2015 to April 10, 2017.

*See* **Exhibit C** (SEC's Response to Defendants' First Set of Interrogatories).

Ultimately, Defendants' dispute is reduced to a complaint about Dr. Smith's use the phrase "other favored accounts" in referring to the first-day performance differential during the pre-Butters period between the "Disadvantaged Accounts" and RRBBAM's other client accounts. Whether those other accounts are referred to as "Other Clients Accounts," as used in the SEC's interrogatory responses, or as "Other Favored Accounts," the nomenclature used in Dr. Smith's report, is a distinction without a difference.

Furthermore, the SEC's theory of liability in this case has remained consistent: Defendants consistently cherry picked unfavorable trades and allocated them to the Disadvantaged Accounts during the entire period at issue, with a corresponding disproportionate allocation of favorable trades to RRBBAMs other accounts, and cherry picked trades to primarily benefit the Butters accounts during the so-called Butters-period from August 2016 to April 2017.

Defendants also argue that Dr. Smith's presents misleading and distorted statistics to "creatively create" larger differences between the categories, to as to create a statistical significance where there may be none. Defendants are mistaken. In Table 2 to her report, at paragraph 31, Dr. Smith present a t-test comparison of allocation returns, making three comparisons: (1) Butters – Disfavored; (2) Other Favored – Disfavored; and (3) Butters – Other Favored. In each instance, Dr. Smith finds a statistically performance differential, consistent with the SEC's theory of the case that Defendants consistently cherry picked unfavorable trades and allocated them to the Disadvantaged Accounts during the entire period at issue, with a corresponding disproportionate allocation of favorable trades to RRBBAMs other accounts, and cherry picked trades to the primary benefit the Butters accounts during the so-called Butters-period from August 2016 to April 2017. Furthermore, the complaint clearly alleges the performance differential between the Butters accounts, and RRBBAM's other accounts, excluding the Disfavored accounts. Complaint, ¶51. While Defendants achieved a positive first day return for both the Butters accounts, and RRBAMs other accounts, the first say return of the other accounts was less than half the performance Defendants achieved for the Butters accounts. *Id.* Accordingly, Defendants cannot be surprised by Dr. Smith's analysis.



May 13, 2022
Hon. Magistrate Judge Edward S. Kiel
Page Sixteen


      In short, Defendants' contemplated motion to strike is frivolous.  If Defendants' think that Dr. Smith's statistical analysis is flawed for any reason, the proper remedy is expose those flaws by competing expert testimony and active cross-examination rather than to exclude the entirety of her report, or to further amend the scheduling order in this case to permit a premature challenge to Dr. Smith's opinions.  *Engers v. AT&T (In Re Engers)*, 2005 U.S. Dist. LEXIS 41693, at * 5 (D.N.J. Aug. 10, 2005).

      For all the foregoing reasons, Defendants' request to amend the scheduling order should be denied.

    *         *         *         *         *         *

Respectfully submitted,

**DLA Piper LLP**

*/s/ Marc A. Silverman*
Marc A. Silverman

**Securities and Exchange Commission**

*/s/ Donald Searles*
Donald Searles

cc:     All Counsel of Record via ECF