# EXHIBIT E

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION_____

In the Matter of RRBB Asset Management, LLC                SEC File No. LA-4791

_____

**SUPPLEMENTAL WELLS SUBMISSION OF
CARL SCHWARTZ and
RRBB ASSET MANAGEMENT, LLC**

Gary Shendell
Matt Tornincasa
Shendell & Pollock, P.L.
2700 N. Military Trail, Suite 150
Boca Raton, Florida 33431
(561) 241-2323

Daniel Viola
Sadis & Goldberg LLP
551 Fifth Avenue, 21st Floor
New York, New York 10176
(212) 947-3793

Attorneys for Carl Schwartz and
RRBB Asset Management LLC

July 27, 2020

**Preliminary Statement**

We submit this memorandum on behalf of RRBB Asset Management LLC ("RRBBAM" or "the Firm"), and Carl Schwartz ("Schwartz") the Managing Member and Chief Compliance Officer of RRBBAM (collectively, "the Respondents"), in response to the Commission Staff's supplemental proposed recommendation that the Commission bring a enforcement action against: 1) Respondents for alleged violations of Section 17(a) of the Securities Act of 1933 ("the Securities Act"), Sections 10(b) of the Securities Exchange Act of 1934 ("the Securities Exchange Act"), Rule 10b-5 thereunder; and Sections 206(1), (2), and 207 of the Investment Advisers Act of 1940 ("the Advisers Act"); 2) Schwartz for alleged violations of 206(1) and (2) of the Advisers Act; and 3) RRBBAM for alleged violation of Section 206(4) of the Advisers Act and Rule 206(4)-7 thereunder. Specifically, the Staff, without any direct evidence and based solely upon statistical analysis that Respondents contend were not properly performed, attempts to allege that the Respondents engaged in a "cherry-picking" scheme that does not involve, whatsoever, any accounts owned by Schwartz or his family. Indeed, based on our discussions with Commission Staff regarding their evolving theory of liability and the related expansion of the timeframe they contend relates to this matter, there does not appear to have been any "favored" account identified by Staff. Rather, there is solely an allegation that a number of trades having unrealized losses at the time of the allocation were allocated to certain "disfavored accounts" from the Firm's omnibus trading account with no indication of what account(s) Schwartz is alleged to have tried to favor. Schwartz denies these allegations entirely and asserts that his allocation of trades was pre-determined and based on multiple factors. Moreover, based on our preliminary analysis, a number of the accounts identified by Commission Staff appear to have not been allocated shares intended for "short term" trades given that these accounts did not realize Short Term Gains or Losses during the period at issue.

We continue to respectfully disagree with the Staff's proposed recommendation and believe it to be premature given the status of the investigation and discussions among the parties and counsel regarding the claims. To that end, in the exchange of documents completed to date; the statistical analysis relied upon by the Commission Staff and the methodology utilized to reach the determinations being relied upon by same in making a recommendation has not been provided to Respondents for the underlying assumptions to be tested and challenged. Indeed, it was only contemporaneous to the issuance of the original Wells Notice that Respondents were provided a copy of the omnibus account trade blotter which provided the underlying data relied upon by Commission Staff, which reflected approximately 16,917 transactions during the subject time period, and, based on the comparative approach that appears to have been taken, requires a grouping and analysis of the entire population of trades in order to properly evaluate same.

Moreover, the recommendation by Commission Staff to proceed with an enforcement action in this matter is literally unprecedented. Every prior "cherry-picking" enforcement action or settlement entered into by the Commission to date has involved an allegation that the allocations resulted in the personal enrichment of either the accused or his or her family. The

2

facts of this matter demonstrate that this is clearly not the case, and there is no allegation that Respondents benefitted from the alleged "cherry-picking" at issue. Previously, the Commission Staff took the position that Respondents motivation for the purported "cherry picking" arose from a desire to show a high net worth client meaningful returns to induce new investments. At this time, it is our understanding that the SEC cannot even support this purported motive across the timeframe they have now expanded their claims. Indeed, beyond the "statistical anomaly" identified by Staff, there does not appear to be any evidence of any particular "favored" account and Staff has not even tendered a potential motive for the alleged activities of the Respondent. There has been no showing by the Staff of any increase in funds invested by any customers resulting from the allegedly improper trading activities. In this regard, Respondents note that the purported "disfavored accounts" at issue in this matter paid an annual management fee percentage that was equal to or higher than other accounts also managed by Respondents, as such, the Respondents would have had no motivation to improperly allocate trades to the subject accounts.

Schwartz gave sworn testimony to Staff on June 21, 2019. Staff issued a Wells Notice to the Respondents on April 21, 2020 in accordance with Rule 5(c) of the Commission's Rules on Informal and Other Procedures, 17 C.F.R. §202.5(c), offering the Respondents to make a submission. At this same time, following numerous requests by undersigned counsel, Staff also made available to Respondent the underlying blotter information they relied upon for the first time. Upon receiving an initial Wells response challenging the basis for Staff's claims, a supplemental Wells notice was prepared and dispatched on July 14, 2020 which purported to expand the timeframe at issue and shifted the focus from 1 allegedly favored client to 2 allegedly disfavored accounts, with no explanation as to a potential motive and no identification of what other client accounts purportedly benefitted from the alleged course of conduct.

At this time, Respondents have not been able to complete an independent statistical analysis of the omnibus account blotter that provided the support for the conclusions reached and relied upon by Staff in making their recommendation. Moreover, Respondents are unable to ascertain whether the analysis performed by Staff considered several factors identified in Schwartz's testimony, including, had trades been allocated differently, would the available cash in the limited number of accounts at issue have been sufficient to allow for the future trades to occur given none of the accounts had margin capability? Similarly, Respondents are unable to determine whether Staff's analysis excluded trades that were intended to build long term positions, as opposed to be used for short term trading, from their analysis. Respondents contend the inclusion of "long term" trades would have skewed the analysis and that additional analysis to address this issue would be required. Moreover, in the 10 days since the Staff's supplemental notice and the expansion of the timeframe. Respondents remain unable to vet what appears to be a still evolving theory of liability that asserts Respondents disfavored accounts, despite no tangible reason to do so.

**Analysis**

The Commission has been criticized in the past for bringing an action without adequate investigation and without giving a defendant the opportunity to explain himself. In *SEC v. Zahareas*, 374 F.3d 624 (8th Cir. 2004), the Commission brought suit without having first interviewed relevant witnesses in Greece or having obtained relevant documents in Greece. The Eighth Circuit held that a victorious defendant in that case was entitled to obtain attorney fees from the government under the Equal Access to Justice Act ("EAJA") because the Staff's investigation had been inadequate. *Id*; *see also U.S. v. Estrich*, 797 F.2d 1454 (8th Cir. 1986) (affirming award of fees under the EAJA where the government, among other things, failed to investigate truth of potentially exculpatory evidence offered by defendant).

In this matter, notwithstanding the amount of time elapsed since this matter was opened, the crux of the discussion, the reasons for and against the allocations of trades in the manner in which they were allocated, whether such trades were for establishing a short or long term position, and a determination of what at-issue accounts were or would have been eligible to participate in the allocation of trades on each day is not complete. To that end, if such analysis has been performed by Commission Staff, the Respondents are not able to respond at this time given the limited time they have had the information in their possession. Indeed, while Staff has expanded the timeframe at issue in the matter, they now appear to have abandoned the motive they previously ascribed to Respondents, as the high net worth client who previously was the centerpiece of their claims was not an RRBBAM client for a substantial part of the expanded timeframe now at issue.

Respondents would further demonstrate to the commission the following points supporting that an action should not be filed and which it appears there has been no investigation into by Staff:  1) the use of an omnibus account was suggested to Schwartz by customer service agents at Charles Schwab, who urged the use of this account to prevent errors and prevent trades from being credited to incorrect accounts by Mr. Schwartz when he was making multiple trades in a day; 2) the complete lack of evidence of any personal enrichment of Respondents, notwithstanding the alleged "scheme" described by Staff; and 3) the imposition of discipline on these facts goes beyond any previously established precedents by the Commission. Indeed, the only apparent change in circumstances predicated on this Supplemental Wells notice is that by expanding the timeframe and shifting the focus to the alleged disfavored accounts, the *de-minimus* nature of the matter, which previously appeared to relate to approximately $20,902 in unrealized losses, is now increased by an as yet undisclosed amount due to Staff's decision to focus on additional trades across a longer time horizon. Of note, based on their preliminary review, Respondents observe that during the 2015-2017 period at issue, The Roesch Foundation account reported ZERO short term gains or losses for the entire period, while the personal account of Greta Roesch reported ZERO short term gains or losses for its 2015 tax year. Similarly, the Tang Estate account identified by Staff also did not report any short term gains or losses during 2015, despite each account receiving allocations of shares from the omnibus account. This point is critical, as considerations of a short term unrealized gain or loss for shares that were acquired with the intent of making a long term investments could significantly skew the analysis, which is, as noted above, the only evidence Staff is relying upon.

**Schwab suggested RRBBAM's Use of An Omnibus Trading Account to Schwartz**

The use of an omnibus trading account by Respondents began only after Schwartz had a series of interactions with technical support staff at Charles Schwab. During these discussions, which pertained to avoiding the misallocation of trades to incorrect accounts, it was suggested to Schwartz that he could prevent the misallocation of trades by using the omnibus account available to him on the Schwab trading platform and subsequently allocating the trades to his clients later, when the market hours were completed for the day. Of note, because the allocation account was being utilized to ensure that shares were correctly allocated among various accounts, the trades being completed in the allocation account were not necessary intended to be short term trades, contrary to the assumptions underlying the analysis by Staff.

Prior to the recommendation from Schwab's support team, Mr. Schwartz had not utilized the omnibus trading account. Indeed, due to this change, the language in RRBBAM's internal policies and procedures ultimately should have been amended at this time to reflect the fact that certain purchases were completed using an omnibus trading account as "block trades". Indeed, a preliminary review of the Omnibus account reflects that true block trades, when a larger quantity of securities is bought and then divided among multiple clients, were exceedingly rare.

Staff obtained a trade blotter reflecting the use of an omnibus account by Respondents during the period January 2, 2015 to June 30, 2017. Initially staff only alleged a "cherry-picking" scheme existed during the period September 2016 to May 2017. In the Supplemental Wells notice, Staff has now alleged improper activity across the entire period reported on the blotter, but now, there has not been an identification of any "favored" account in the expanded time frame. To the contrary, there is only identification of two disfavored accounts, with no suggestion as to any motivation for Respondents to disfavor these accounts until the purported favored account is opened.

Even with the use of the omnibus account as suggested by Schwab, the majority of trades performed by Schwartz remained purchases and sales intended for a single investor and the omnibus account was not used to make significant joint purchases or sales. Indeed, while Staff appears to have considered any trade via the omnibus account as intended for short term trading for purposes of their cherry picking analysis, the reported short term gains and losses in the underlying disfavored accounts appears to contradict this position. There is no evidence that Staff considered whether any particular trade was intended for a short term or long term holding period and controlled for same in performing their analysis.

Moreover, when Respondents switched their trading platform to TD Ameritrade in 2017, any alleged "cherry-picking" behavior ceased because of different restrictions and technological controls on the use of an omnibus account and allocation of trade proceeds put into place by TD Ameritrade on their platform. Whereas the Schwab omnibus account allowed allocation of an entire trade to a single account's benefit, this same behavior is prohibited by TD Ameritrade's system which pops up a warning advising that the proposed allocation would violate FINRA Rule 4515.

**The Amounts in Controversy**

Respondents recognize the position repeated by Staff that "cherry-picking" relates to the integrity of market participants and is therefore material regardless of the amount alleged to be in controversy. Notwithstanding, when the sole support for the "cherry-picking" allegation is a statistical analysis, the amounts at issue are clearly relevant. Commission Staff has not provided an updated calculation of the unrealized gains and losses based on first day performance. Previously, the total amount in controversy, based on a shorter time frame, was approximately $51,000. As noted above, between purchases, sales, allocations and offsets, over $700,000,000 in equities flowed through the subject omnibus account during the period that Respondents utilized the Schwab omnibus account (January 2015 to June 2016). As noted above, it does not appear that Staff has made any analysis of the actual realized performance of any of the trades or the holding period for same. Instead, it appears Staff's analysis treated all trades made via the Allocation Account as potential short term trades, with no regard for whether Respondent was actually attempting to make a "day trade" or to open a longer term position.

Respondents note that the owners of the alleged disfavored accounts, who had all of their accounts aggregated by Staff, are substantial investors, and, as such, it is now possible for the Staff to assert that more significant amounts are impacted. However, in doing so, the Commission must necessarily disregard the fact that substantial assets owned in each account were consistently invested on a long term time horizon. Thus, while Staff can now assert that larger accounts were involved, without removing trades intended for longer term positions, the actual amount now in controversy cannot be appropriately evaluated.

**Enforcement Precedent**

The allegations of "cherry-picking" in this matter are unique, in that unlike every prior disciplinary order and settlement, there are no allegations in this matter of a direct benefit to the individual alleged to have engaged in "cherry-picking" in connection with investment management. Put another way, in every other "cherry-picking" case that resulted in discipline, the individual(s) alleged to have engaged in the illicit activity personally benefitted from the purported disproportional allocations. Indeed, in the Staff's expanded timeframe, there is not even an allegation of a specific "favored" account or any motivation by Respondents to disfavor the accounts identified.

In connection with *In the Matter of Financial Sherpa, Inc., and James L. Beyersdorf,* an August 20, 2019 settlement, the Commission accepted a settlement and imposed sanctions against Respondent Beyersdorf who received $232,166 in proceeds from options trades allegedly improperly allocated to his and his wife's personal account over a four year period.

Similarly, *In the Matter of Joseph B. Bronson,* a September 2019 settlement, and the related litigation *SEC v. Strong Investment Management*, Mr. Bronson ultimately disgorged $960,656 in the proceeds of his alleged improper activity which were believed to have continued for a period of approximately four years.

Moreover, *In the Matter of Valor Capital Asset Management LLC, and Robert Mark Magee,* a March 2018 settlement, the SEC alleged that over a 3 year period, Magee realized $349,643 in first day profits, with an additional $26,448 obtained during a 3 month period after Magee changed to a new trading platform.

Finally, *In the Matter of TPG Advisors, LLC d/b/a the Phillips Group Advisors and Larry M. Phillips*, a December 2016, settlement, the SEC alleged and respondents admitted that respondent Phillips allocated profitable trades to a series of "favored accounts" including his friend, his cousin, and two longtime clients over a period of 4 years, over a number of warnings from his clearing brokers.

Unlike the above referenced matters, the investigation by Staff has not linked even one allegedly "cherry-picked" trade to any account owned by Schwartz, or any member of his family. While the other individuals pursued and disciplined in enforcement actions for alleged "cherry-picking" realized hundreds of thousands of dollars in personal profits, there was no such motivation for Schwartz, no payoff for the alleged misconduct. Indeed, at this point, based on the expanded timeframe, there is not even a "favored" account that Staff has identified to Respondents for a majority of the time frame at issue.

Indeed, while the Staff's revised Wells notice expands the purported "cherry-picking" period from months to potentially years (in response to one of the arguments made against the original Wells notice) there remains no evidence that the analysis performed by Staff drew any distinction between efforts to open long term positions versus efforts to make and capture profits in a short term trade.

Finally, in various other SEC "cherry picking" cases, there was a fee conflict that is also not present under these facts.  As noted, the potentially disfavored accounts paid investment management rates equal to or higher than other accounts managed by Respondents.  As such, Respondents lacked any motive to disfavor these accounts.  Prior actions brought by Staff alleging benefits to "favored" accounts also involved an underlying advisor agreement whereby the clients paid "performance fees" and the percentage of profit on such winning trades therefore inured directly to the advisor's benefit.  This is not the case here. All of RRBBAM's clients are and were charged fixed management fees ranging between approximately (0.50 to 1.5%) per year based only on the assets under management of each client.

## **Conclusion**

This matter should not be pursued further by the Commission.  Staff's recommendation to the Commission in this matter remains premature, at best, and the facts of this case fall far below the recent and historical facts that would give rise to a "cherry-picking" action.  The changes in the timeframe undermine the theory of liability that the Staff originally presented.

Staff should not be trying to "fit" their facts to support a case, and should be instructed to discontinue this matter.

Moreover, even if the Commission determines that the statistical analysis and conclusions reached by Staff should be addressed, the specific allegations in the Wells Notice can be corrected with a Commission issued deficiency letter rather than an enforcement action, in particular given the fact that Respondents ceased the use of Schwab's platform, and the associated omnibus account in 2017 and there is no concern of any other issues other than through the use of such an account. Respondents remain open to a continuing limitation on their use of any omnibus accounts and/or block trading on a going forward basis to continue to alleviate any concerns relative to potential for allocations.

Moreover, Respondent Schwartz, remains in the process of retiring given his age (65). Indeed, he anticipates that he will cease working with RRBBAM before the end of this year. Here, a statutory bar would not serve any logical purpose and would only unfairly punish Mr. Schwartz because he is voluntarily resigning from RRBBAM and will no longer be involved in the securities industry by his own volition. Spending additional expense and time on this matter would be a waste of judicial resources. Moreover, the potential conflicts associated with Mr. Schwartz allocating trades at the end of the day was completely mitigated by RRBBAM's own efforts over two (2) years ago when it voluntarily ceased this practice, well before the Staff started their investigation.

In sum, based on the lack of fee conflicts, the apparent failure of Staff to account for long erm vs short term trading in conducting their own analysis to reach their self-serving conclusions, and the fact that Mr. Schwartz only started to use the allocation account at Schwab because he was told by personnel at Schwab that it would help reduce the operational errors resulting from his direct trades that he was customarily entering when he was with Schwab (and that Schwab's system was designed to allow trading in violation of FINRA Rules), we respectfully request that this matter be resolved with a deficiency letter and the Staff not file a formal complaint. Moreover, given the impending retirement of Schwartz, going forward with this case would be a waste of the Staff's valuable resources and prove to be incongruent with prior cases that the Staff has brought in the past.

Respectfully submitted,

<u>Gary Shendell, Esq.</u>
Shendell & Pollock, P.L.
2700 N. Military Trail, Suite 150
Boca Raton, Florida 33431
(561) 241-2323, phone
(561) 241-2330, fax

<u>Daniel G. Viola, Esq.</u>
Sadis & Goldberg LLP
551 Fifth Avenue, 21st Floor
New York, New York 10176
(212) 573-8038, phone
(212) 573-6663, fax
